STATE of Iowa, Appellee,

v.

Jimmy TORRES, Jr., Appellant.

No. 90–1928.

Supreme Court of Iowa.

Feb. 17, 1993.

Linda Del Gallo, State Appellate Defender, and Andi S. Lipman, Asst. State Appellate Defender, for appellant.

Bonnie J. Campbell, Atty. Gen., Ann E. Brenden, Asst. Atty. Gen., and Allan W. Vanderhart, County Atty., for appellee.

LAVORATO, Justice.

This tragic case comes to us on further review from the court of appeals. The defendant was convicted after a bench trial of involuntary manslaughter for the death of his wife. *See* Iowa Code § 707.5(2) (1989). She bled to death after falling on a piece of glass from a lamp the defendant had swept to the floor just moments before.

The court of appeals, like the district court, found sufficient evidence that the defendant's behavior in breaking the lamp was reckless. Because we disagree, we vacate the decision of the court of appeals, we reverse the district court's judgment of conviction, and we remand for entry of a judgment of acquittal.

Brenda and Jimmy Torres, Jr., were married on February 14, 1989. They shared their home in Independence with Jimmy's sixteen-year-old uncle, Steve Torres, and Brenda's ailing father, Herbert Cusick.

On Friday, February 2, 1990, Jimmy picked Steve up from a doctor's appointment. The pair went to Wal–Mart to pick out a wedding anniversary gift for Brenda. Jimmy and Steve then stopped at Kentucky Fried Chicken, purchased dinner, and returned home. There, Jimmy gave Brenda her presents, and the trio ate dinner. Brenda was very pleased with her gifts—a gold necklace and bracelet.

Because this was Brenda's bowling night, Brenda, Jimmy, and Steve later went to the bowling alley. Brenda showed off her gifts to her bowling friends. Jimmy drank beer; Brenda preferred gin and tonics.

Over the course of the evening, Brenda consumed enough alcohol to become intoxicated. She did not bowl well and her mood changed accordingly. Her speech became slurred and she began speaking in a loud tone of voice.

When Brenda finished bowling at about 9:30 p.m., Jimmy was playing cards with friends. Brenda took a seat at a nearby table; she drank and talked with a friend for about an hour and a half.

Jimmy continued playing cards. Brenda moved to a booth behind Jimmy and began chatting with another friend. The more Brenda drank, the more she complained about her life in general. Eventually Brenda's friend left. At this point Brenda put her head down on the table and fell asleep.

About 2 a.m., Jimmy, Brenda, and Steve left the bowling alley and headed for home in the family van. Jimmy drove. As they were exiting the van and entering the house, Brenda remarked that a new girl had been watching Jimmy all evening. Jimmy let the comment pass.

After the three went into the house, Brenda immediately went upstairs. Jimmy stayed downstairs with Steve and watched television with him for a few minutes. He hoped Brenda would "cool off" if left alone. Jimmy then went upstairs, leaving Steve to watch television.

Jimmy found Brenda sitting on the side of their bed facing the doorway. She was clad in her underwear and her bowling shirt. Jimmy sat next to Brenda and tried to talk to her. Brenda again brought up the girl at the bowling alley.

Jimmy told Brenda that she was "seeing things." Brenda slapped Jimmy. He responded in kind. During the altercation he beat her about the face and head and tore her shirt and bra from her body, leaving her in her underpants. He then turned to the nightstand between the waterbed and the doorway and, with a sweeping motion, cleared everything off the top of it. Among the things that went crashing to the floor was a large glass lamp and a telephone. The lamp shattered, littering the floor and doorway with large and small pieces of glass. Jimmy said he was leaving and walked out the bedroom door, kicking the large broken lamp as he left.

Brenda then cried out to Jimmy that "she was cut." Jimmy turned back and saw Brenda lying on her side somewhere between the bed and the doorway. Blood

was gushing profusely from a cut in her left groin area. Unknown to Jimmy and Brenda, her wound was mortal. In the fall she had severed her left femoral artery and vein.

Jimmy put his arm around Brenda and helped her back to the bed. He tried to stop Brenda from thrashing around. He put a pillow over the wound, applying pressure in an attempt to stop the bleeding.

Jimmy pleaded with Brenda to lie still. Eventually she told Jimmy she thought she was dying. She asked for a cold rag because she felt hot.

Jimmy ran downstairs and moistened a kitchen towel. He ran back to Brenda, placing the cold towel on her cheeks and forehead. By now Brenda was unable to speak, making only gurgling sounds. Jimmy ran back downstairs and called 911. He told Steve that Brenda was hurt, and to send whoever responded to the call directly upstairs. Jimmy then returned to Brenda's side.

An Independence police officer was the first to arrive on the scene. He found Jimmy still swabbing Brenda's face. Jimmy begged him to find a pulse because Jimmy could not. The officer was also unsuccessful, but he assured Jimmy that help was on the way and that everything would be all right.

By now a second officer arrived and checked Brenda for a pulse. He found none, but assured Jimmy that emergency medical personnel would be there shortly.

Once the emergency medical personnel arrived, Brenda was again checked for a pulse and vital signs. She had neither. Jimmy, who was still at Brenda's bedside, was told that Brenda was dead. She had bled to death. According to the coroner who testified at Jimmy's trial, a person who had suffered a cut that severed the femoral artery and femoral vein would bleed to death within five to seven minutes.

Jimmy became despondent. He started yelling "no" and said he would join Brenda soon. The officers, fearing that Jimmy might jump out the second story window, tried to subdue him. A scuffle ensued.

During the scuffle, another lamp like the one that had been broken earlier, was kicked to the floor. It, however, did not break.

It took four officers to eventually subdue Jimmy. Jimmy was then handcuffed, led downstairs, and placed in a chair. Jimmy denied that Brenda was dead and continued asking whether Brenda would be all right. He was eventually taken to the police station where he was held on an open charge of murder.

A scaled drawing of the bedroom and pictures of the scene show four large pieces of glass in the area of the doorway. Three of the pieces were inside the bedroom. A fourth was just outside the bedroom. It was on one of the three pieces inside the bedroom that Brenda had fallen and cut herself. The distance between the bed and the doorway is a little more than four feet.

The State charged Jimmy with involuntary manslaughter. *See* Iowa Code § 707.-5(2). It also charged him with assault causing bodily injury. *See* Iowa Code §§ 708.1(1), 708.2(1). Following a bench trial, the district court convicted Jimmy of both offenses. After denying Jimmy's posttrial motions, the court sentenced him to a two-year indeterminate term on the manslaughter conviction and to the county jail for 180 days on the assault causing bodily injury conviction. The sentences were to run concurrently.

Following Jimmy's appeal of both convictions, we transferred the case to the court of appeals which affirmed the convictions. Jimmy applied for further review only on the involuntary manslaughter conviction. We granted the application and the case is now before us.

I. Jimmy moved for a judgment of acquittal at the close of the State's case and again at the close of all the evidence. His grounds were that the evidence was not sufficient to sustain a conviction. The district court reserved ruling. Later in its written decision the district court overruled the motions and went on to find Jimmy guilty. On appeal Jimmy challenges the rulings on both motions.

■ The district court's finding of guilt is binding upon us unless we find there was not substantial evidence in the record to support such a finding. *State v. Robinson,* 288 N.W.2d 337, 338 (Iowa 1980). In determining whether there was substantial evidence, we view the record evidence in the light most favorable to the State. *Id.* Substantial evidence means such evidence as could convince a rational trier of fact that the defendant is guilty beyond a reasonable doubt. *Id.* at 339.

■ A reviewing court cannot make a substantial evidence determination if it considers only the evidence supporting guilt. This is so because a rational fact finder cannot render a verdict without taking into consideration *all* the record evidence. So in determining whether there is substantial evidence, we must consider all the record evidence, not just the evidence supporting guilt. *Id.* at 340.

II. A person commits involuntary manslaughter under Iowa Code section 707.5(2) when

the person unintentionally causes the death of another person by the commission of an *act* in a manner *likely* to cause death or serious injury.

Iowa Code § 707.5(2) (emphasis added). The State charged the offense this way:

The defendant, on or about the 3rd day of February, 1990, in Buchanan County, Iowa, did: unlawfully and unintentionally cause the death of Brenda Torres by recklessly committing an act, to wit: destroying property, in a manner likely to cause death or serious injury.

This allegation acknowledges that recklessness, though not mentioned in the statute, is nevertheless an additional element that must be proven to sustain a conviction for involuntary manslaughter. *See State v. Kernes,* 262 N.W.2d 602, 605 (Iowa 1978). This court has described what recklessness is in the context of involuntary manslaughter cases:

In absence of a controlling statute, we are persuaded there should be but one standard of conduct applicable in these involuntary manslaughter cases. Culpable conduct should require proof of reck-lessness, that is, conduct evidencing either a willful or wanton disregard for the safety of others. Ordinarily, such conduct should be conscious and intentional, creating an unreasonable risk of harm to others, where such risk is or should be known to defendants.

*State v. Kernes,* 262 N.W.2d 602, 605 (Iowa 1978) (citations omitted). A more complete discussion is found in William L. Prosser, *Handbook of the Law of Torts* § 34, at 185 (4th ed. 1971):

The usual meaning assigned to "willful," "wanton" or "reckless," according to taste as to the word used, is that the actor has intentionally done an act of an unreasonable character in disregard of a risk known to him or so obvious that he must be taken to have been aware of it, and so great as to make it highly probable that harm would follow. It usually is accompanied by a conscious indifference to the consequences, amounting almost to willingness that they shall follow; and it has been said that this is indispensable. Since, however, it is almost never admitted, and can be proved only by the conduct and the circumstances, an objective standard must of necessity in practice be applied. This requirement therefore breaks down, and receives at best lip service, in any case where it is clear from the facts that the defendant, whatever his state of mind, has proceeded in disregard of a high degree of danger, either known to him or apparent to a reasonable man in his position. The result is that "willful," "wanton" or "reckless" conduct tends to take on the aspect of highly unreasonable conduct, or an extreme departure from ordinary care, in a situation where a high degree of danger is apparent.

■ Simply put, for recklessness to exist the act must be fraught with a high degree of danger. In addition the danger must be so obvious from the facts that the actor knows or should reasonably foresee that harm will probably—that is, more likely than not—flow from the act.

■ Here the critical act was sweeping the lamp off the table, an act that by itself is not highly dangerous or unlawful. This is not a case of an intoxicated defendant pointing a loaded gun at someone. Nor is it a case of a defendant loading a gun and placing it near a person known to him to be suicidal and intoxicated. Both cases are perfect examples of highly dangerous acts constituting recklessness. *See Kernes,* 262 N.W.2d at 603, 606; *State v. Marti,* 290 N.W.2d 570, 575 (Iowa 1980).

■ In judging whether this act—sweeping the lamp off the table—was reckless, the district court could not use hindsight. The court had to put itself in Jimmy's shoes at the moment of the act and then determine whether the act was reckless. In other words, given the circumstances at the time, was the act so dangerous that Jimmy knew or should have foreseen that this act would probably result in death or serious injury to Brenda? Viewing the evidence in the light most favorable to the State, we think not.

For the State to establish recklessness, Jimmy would have had to know or it would have had to be obvious that a number of things would probably—not possibly—have happened because of his act. We think too many things would have had to be obvious to him at the time.

First, he would have had to know or foresee that the lamp would probably break when he swept it off the table. The evidence is that the lamp had fallen before and had not broken. During the scuffle between the police and Jimmy, a lamp identical to the lamp that was broken was knocked to the floor but did not break. Second, Jimmy would have had to know or foresee that Brenda would probably follow him, fall, and impale herself in a vital area of the body on a piece of glass that was more than four feet away from her. We think it is unreasonable to expect Jimmy to have known or to have foreseen the chain of events that ultimately led to Brenda's death.

The record suggests to us a tragic, freak accident. The county medical examiner had it exactly right when he testified:

I think it's one of those freak things that probably just happened, and I think—and because of that, I conjecture that it's accidental.

By our decision we do not mean to condone the beating Jimmy inflicted upon Brenda. For this he was convicted of assault causing bodily injury and sentenced to the county jail for 180 days. Jimmy has not challenged this conviction on appeal.

III. The evidence was not sufficient to establish the element of recklessness necessary for an involuntary manslaughter conviction. For this reason the district court erred when it overruled Jimmy's motion for judgment of acquittal. We vacate the decision of the court of appeals, we reverse the district court's judgment of conviction, and we remand for entry of a judgment of acquittal.

DECISION OF COURT OF APPEALS VACATED; JUDGMENT OF DISTRICT COURT REVERSED; CASE REMANDED WITH DIRECTIONS.

All Justices concur except NEUMAN, HARRIS, SNELL, and ANDREASEN, JJ., who dissent.

NEUMAN, Justice (dissenting).

This is, indeed, a tragic case. According to the majority the case is about a broken lamp and the "freak accident" that followed. It is not. This case is about reckless conduct that the district court aptly described as "the final act in an episode of domestic violence." Because the majority substitutes its judgment for the district court's, and thereby refuses to hold Torres responsible for his recklessness, I respectfully dissent.

My disagreement with the majority begins with its recitation of the facts. Crucial details supporting the district court's verdict are not adequately considered. For example, the majority describes "the act" this way:

Brenda slapped Jimmy. He responded in kind. During the altercation he beat her about the face and head and tore her shirt and bra from her body, leaving her in her underpants. He then turned to

the nightstand between the waterbed and the doorway and, with a sweeping motion, cleared everything off the top of it.

The district court, whose fact-finding we are bound to accept in this law action, described a more violent scene:

[I]tems were later found strewn about the northeast corner of the room, including a shoe, flashlight, ash trays, writing instruments, metal pan, fingernail clippers, hairbrush, Mason jar, items of clothing, tweezers, make-up, bracelet and a waste basket. A brassiere hook found clinging to Brenda Torres' upper back, the fact that the brassiere had hooks missing and the manner in which her bowling shirt was torn all establish that the blouse and brassiere had been forcibly ripped off her during the course of a violent struggle with the defendant.

Contrary to the testimony of the defendant at trial to the effect that he only slapped his wife once and previous statements to the effect that he only slapped her twice, the autopsy conducted by Dr. Stephens established that the defendant struck his wife a number of times about the face and head.... His autopsy indicated that Brenda Torres had recently been struck on the right side of her mouth, most likely with the defendant's fist. Brenda Torres had recently been struck with a blunt force on the right cheek. She had recently been struck on the left cheek with a patterned object, possibly a watchband. She suffered a recent bruise on the right chin, and a recent blow to the left chin. She suffered contusions about the lower neck area. In addition, Brenda Torres had been struck several times about the scalp area with a blunt, rectangular object....

The defendant grabbed the telephone as well as a lamp made from a glass jug that were located on the table to the east of the bed and threw them down on the floor, breaking the lamp. He said he was leaving and walked out the bedroom door, kicking the broken lamp on his way out.

I highlight this contrast because the weight given the surrounding facts and circumstances is crucial in determining the "culpability of a person's unintentional death-causing conduct." *State v. Kernes*, 262 N.W.2d 602, 605 (Iowa 1978). The culpable conduct must be reckless, that is, evidencing a willful or wanton disregard for the safety of persons or property. *State v. Conner*, 292 N.W.2d 682, 684 (Iowa 1980); *Kernes*, 262 N.W.2d at 605; *see* Iowa Code § 702.12 (defining "reckless"). But according to our *Kernes* decision, an activity's "inherent risk to others" is only one—and not necessarily the decisive—factor. The defendant's conduct must also be assessed in light of "the activity he or she engaged in at the relevant time." *Kernes*, 262 N.W.2d at 605. This broadening of the zone of danger is in keeping with the statutory proscription against "the commission of an act *in a manner* likely to cause death or serious injury." Iowa Code § 707.5(2) (emphasis added).

Because the majority focuses so narrowly on the single act of breaking a lamp, it is not surprising that it finds "the act" insufficient to establish the requisite recklessness under the statute. I believe its analysis is faulty in two respects. First, as already noted, it wholly ignores *the manner* in which the act was performed, that is, the context in which a reasonable fact finder could conclude that Torres' act was reckless. Second, it defines recklessness by a new, higher standard—"fraught with a high degree of danger"—that is beyond the scope of the criminal code and our prior cases.

In keeping with a declared policy of uniformity, our criminal code requires that the way in which a word is defined in chapter 702 shall be the meaning given "wherever it appears in the Code." Iowa Code § 702.1. The Code states that "[a] person is *'reckless'* or acts recklessly when the person willfully or wantonly disregards the safety of persons or property." Iowa Code § 702.16. In *State v. Caldwell*, 385 N.W.2d 553, 556 (Iowa 1986), we found no merit in a defendant's allegation that the term recklessness should "expressly require conduct creating a high and unreasonable risk of death." Without saying so

the majority has substantially departed from *Caldwell* here, much to the detriment of future involuntary manslaughter prosecutions.

The district court, properly applying the statutory definition of recklessness as the standard by which to judge the culpability of Torres' act, found the State proved each of the essential elements of the crime. Torres' act of breaking the lamp was conscious and intentional. He knew or should have known that the large shards of glass left in the doorway of the small room posed a risk of serious injury to anyone attempting to negotiate the threshold. He knew that Brenda's ability to do so was impaired by her intoxication and the beating he had just inflicted. His blows to her head would have likely left her dazed. It was foreseeable that she would inevitably encounter the dangerous condition he had created. The risk of injury was heightened by Brenda's partial state of undress. Taken together, the court found these factors established a sufficient causal relationship between Torres' reckless disregard for the consequences of his act and the probable harm that would result.

The majority concludes, as a matter of law, that the consequence of Torres' act was not foreseeable. But by usurping a decision traditionally left to the fact finder, and by defining the death-causing act so narrowly, the majority has excused conduct that meets the *sine qua non* test for criminal culpability: but for Torres' conduct, the fatal injury to his wife would not have occurred. *State v. Marti*, 290 N.W.2d 570, 585 (Iowa 1980). Moreover, I know of no policy in the law that would prevent the otherwise harmless act of breaking a lamp from meeting the test of legal causation given the violent context in which the damage was here carried out. *Id.*

I would affirm Torres' conviction for involuntary manslaughter.

HARRIS, SNELL and ANDREASEN, JJ., join this dissent.