STATE of Iowa, Appellee,

v.

**Daniel TOVAR, Jr., Appellant.**

No. 96–2104.

Supreme Court of Iowa.

July 1, 1998.

Linda Del Gallo, State Appellate Defender, Tricia A. Johnston, Assistant State Appellate Defender, and Ursula Koenig, Student Legal Intern, for appellant.

Thomas J. Miller, Attorney General, Martha E. Boesen, Assistant Attorney General, Thomas J. Ferguson, County Attorney, and Linda Hall, Assistant County Attorney, for appellee.

Considered by McGIVERIN, C.J., and LARSON, LAVORATO, ANDREASEN, and TERNUS, JJ.

LARSON, Justice.

Daniel Tovar, Jr. was convicted of two counts of theft by deception as defined by Iowa Code section 714.1(3) (1995), arising out of two transactions in his carpeting and wall covering business. We conclude that the evidence was insufficient to support the conviction and therefore vacate the court of appeals decision, reverse the judgment of the district court, and remand for dismissal of the charges.

## I. *The Facts.*

Two transactions are involved—one with Ann Russell and the other with a couple named Hanson. On September 18, 1995, Russell ordered carpeting from Tovar, who told her he would have the carpeting install-ed about October 20. When Russell ordered the carpet, she gave Tovar a check for $687.10, representing half of the cost of the carpet job. Russell started to write the check out to "C and H," Tovar's business name, but Tovar told her that he would supply the name of the payee. He wrote in his own name. He said this was because his bank had "changed over," and it did not want him to fill out the checks in the name of his business. Russell testified that she understood that the down payment was to go toward the purchase of the carpet, padding, and installation.

The carpet was not installed on the agreed date, and Russell made several attempts to contact Tovar by telephone. Tovar eventually returned her call and told her that he had lost his carpet installer. He said he was trying to find a replacement and would call her back. Russell did not hear from Tovar again until she received a letter of November 14 informing her that Tovar had filed for bankruptcy.

Ronald and Margaret Hanson had a similar experience. On September 22, 1995, Margaret ordered carpet, wallpaper, and hardwood flooring from Tovar. She gave Tovar a check for $1161.65, half of the cost of the job. On September 26 she gave Tovar a check for $153.68, which was half of the total cost of the hardwood flooring. Tovar requested that the customer write Tovar's name on the checks, rather than the company's name. This time he said the reason for not naming his business was that the business had just moved. (On the Hanson checks, as well as the Russell check, the memo line said it was for C & H Floor Covering.) Ms. Hanson understood that this down payment was to go toward the carpeting. Tovar told her that the carpeting would be installed on October 16 or 17.

Several days after the Hanson carpet was to be installed, Tovar called and told Margaret that there was not enough carpeting available, so more would have to be made at the mill. He would install it as soon as he received it. He estimated that it would be installed in approximately two weeks, but it did not happen then either.

Eventually, Tovar contacted Margaret about the wall covering and returned her money for it. When she asked Tovar about the carpeting, he told her that his bookkeeper had run off with his money. The next time Tovar called was on November 8. At that time, he spoke with Ronald Hanson, Margaret's husband. Tovar told him that the carpet had arrived, but he needed the other half of the money to get it. Mr. Hanson refused to pay the second half, and he asked Tovar how many people had had the same kind of experience with Tovar. Tovar said it was eight. Mr. Hanson terminated their agreement over the telephone and asked that Tovar refund their money.

On November 9 the Hansons sent Tovar a letter reaffirming their request that he refund the carpet deposit of $1161.65 and the wood flooring deposit of $153.68. The Hansons soon received a letter saying that Tovar's business was closed, and all correspondence should be through his attorney. Tovar's attorney notified the Hansons that Tovar had filed for bankruptcy. The Hansons contacted the sheriff, and this prosecution followed.

The State filed two trial informations, one for theft in the second degree (a class "D" felony) involving the Hansons, and one for theft in the third degree (an aggravated misdemeanor) involving Russell. The charges were consolidated and tried to the court without a jury.

## II. *Scope of Review.*

On an appeal from a bench trial, the court's fact-finding is binding unless it is unsupported by substantial evidence. *State v. Torres,* 495 N.W.2d 678, 681 (Iowa 1993). We view the evidence in the light most favorable to the State. Substantial evidence means evidence that could cause a rational trier of fact to conclude that the defendant is guilty beyond a reasonable doubt. We consider all of the record evidence, not just the evidence that supports guilt. *Id.*

## III. *The Law.*

Our theft-by-deception statute provides:

A person commits theft when the person does any of the following:

. . . .

3. Obtains the labor or services of another, or a transfer of possession, control, or ownership of the property of another, or the beneficial use of property of another, by *deception.*

Iowa Code § 714.1 (1995) (emphasis added).

Chapter 702 contains these definitions of "deception" relied on by the district court:

*"Deception"* consists of knowingly doing any of the following:

1. Creating or confirming another's belief or impression as to the existence or nonexistence of a fact or condition which is false and which the actor does not believe to be true.

. . . .

5. Promising payment, the delivery of goods, or other performance which the actor does not intend to perform or knows the actor will not be able to perform. Failure to perform, standing alone, is not evidence that the actor did not intend to perform.

Iowa Code § 702.9.

We recently discussed theft by deception:

We have never interpreted theft by deception. Some historical background, therefore, is helpful. Iowa Code section 714.1(3), theft by deception, replaced sections criminalizing theft by "false pretenses." 1976 Iowa Acts ch. 1245, § 1401 (codified at Iowa Code supp. § 714.1(3) (1977)); 1976 Iowa Acts ch. 1245, § 526 (repealing Iowa Code ch. 713, false pretenses, frauds, and other cheats §§ 713.1–713.43). In enacting section 714.1(3), theft by deception, the legislature—for the most part—followed the lead of the American Law Institute Model Penal Code (1980) [hereinafter Model Penal Code] in its definition of theft by deception. So the Model Penal Code commentaries on the definition are persuasive authority in our interpretation of our own theft by deception statute.

. . . .

The change in language from theft by "false pretenses" to theft by "deception" clarified the legislature's intent to criminal-

ize every instance of a person obtaining another person's property by deception. *State v. Hogrefe*, 557 N.W.2d 871, 876–77 (Iowa 1996).

The district court found violations of both Iowa Code sections 702.9(1) (creating false belief) and 702.9(5) (promising delivery without intent to perform). The court found that Tovar misrepresented to his customers that he would apply their down payments to the purchase of the carpeting that they had ordered. It also found that Tovar created or confirmed the customers' belief that there was no risk in doing business with him.

It is clear that plenty of lying was going on here. Tovar gave two different reasons for requesting payment to him rather than his business—one reason given to Russell and one to Hanson. Both of the stated reasons were untrue; Tovar testified at trial that:

I had bank problems. As you know I had the liens on the accounts and I had overdrawn checks that had bank fees, overdraft fees. At that time if I was to cash a check, I probably would have lost the check either to the Iowa Department of Revenue or for fees. So in order for me to continue, I needed to cash that check at [Ms. Hanson's] bank to get supplies to keep open.

Tovar thus admitted the falsity of his statement to Ms. Hanson about the reasons for naming himself as payee. Other statements to his customers, such as he did not deliver the carpet because the factory had to make more of it and that his bookkeeper had run off with his money, were likely false as well.

■ A. *The application of section 702.9(1).* The court found that Tovar had created a false belief in violation of this section because he had misrepresented to his customers that he would buy their carpet with their down payments. However, both Ms. Russell and Ms. Hanson testified only that they had assumed that he would use their down payments in this manner; there was no evidence that he told them or even inferred that he would. *Cf. State v. Caslavka*, 531 N.W.2d 102, 106–07 (Iowa 1995) (in absence of assurance by defendant at the time of the transaction that customers' mon-

ey would be applied to specific purchase, defendant could not be convicted of theft by misappropriation). Even when considered in the light most favorable to the State, there is no substantial evidence to support the court's finding that Tovar created a false belief about how he would apply his customers' down payments.

■ In addition, the court concluded that Tovar had violated subsection (1) by "creat[ing] or confirm[ing the customers'] belief that there was no risk in doing business with him." The court's finding stated:

He disclosed none of these [financial] facts to Ms. Russell or Ms. Hanson and, moreover, he concealed his business problems from them by misrepresenting the reason that he did not want their down payment checks to be made payable to his business. Although it may have been his belief that his business would turn around, he neither shared that belief with Ms. Russell or Ms. Hanson, nor gave them any opportunity to decide whether they were willing to share that risk with him. As an ultimate fact, the Court finds that he created or confirmed their impression that he was solvent and doing business as usual which he knew was untrue.

When considered in the light most favorable to the State, the evidence showed that Tovar was "robbing Peter to pay Paul" by applying current receipts to his earlier carpet purchases. He was in a very precarious financial position, probably insolvent, and he did not inform his customers of that fact; and he lied.

Although Tovar did not disclose his financial condition to his customers, this does not amount to deception. A comment to the Model Penal Code, after which our statute is patterned, states:

Mere failure to correct a known misimpression that is influencing the owner of property would not amount to "reinforcing," except in the situations specifically covered in Paragraphs (3) [failing to correct false impression which the deceiver previously created] and (4) [failing to disclose a known lien or other impediment].

Any affirmative contribution to the misimpression, however, may suffice.

Model Penal Code § 223.3 cmt. 3(a) at 185 (1980).

In the analogous area of purchases by an insolvent buyer,

> [t]here is substantial authority to the effect that mere silence as to one's financial status, solvency, and credit does not amount to fraud. As a general rule, a purchaser, when buying on credit, is not bound to disclose his financial condition to the seller, and mere silence as to his pecuniary condition does not constitute fraud, even if his ability to pay is doubtful, his financial condition is desperate, or he is insolvent. Failure to disclose such facts is not a fraud where no inquiry is made and no untrue, evasive, or partial answers are given to any questions that may be put, and where there is no fraudulent purpose, no preconceived design not to pay for the goods, and no lack of a reasonable expectation of being able to do so.... The reason given for the rule is that the law does not deny the possibility of an honest purchase of goods on credit by an insolvent person, without a disclosure of the fact, particularly if he himself does not know that he is insolvent.

37 Am.Jur.2d *Fraud and Deceit* § 171, at 229–30 (1968) (footnotes omitted).

In an analogous Alabama case, a farmer delivered grain to the defendant for storage. The defendant did not inform the farmer that he was insolvent. When the farmer attempted to sell his grain, he discovered it was gone. The defendant was tried under a theft-by-deception statute similar to ours. The state contended that the defendant deceived the farmer by failing to advise him of his financial condition. The defendant was convicted. The appellate court reversed, saying:

> The only possible evidence of deception was that the appellant, Swinney, knew he was in default on his loan ... before [the farmer] brought in his soybeans ... for storage.... However, the mere fact that the appellant knew he was having financial problems and did not tell [the farmer] does

not amount to deception as defined by the Alabama Code.

*Swinney v. State*, 482 So.2d 1326, 1329 (Ala. Crim.App.1985).

Tovar's failure to voluntarily disclose his financial condition did not amount to deceit under section 702.9(1). While the State relies on the fact that Tovar affirmatively misstated the reasons for changing the payee on the checks, this is not substantial evidence of an attempt to hide his financial condition. It is, in fact, more likely that it was done for the reasons admitted by Tovar in his trial testimony: that, by keeping the customers' down payments away from other creditors, Tovar would be in a better position to perform his contracts with his customers.

B. *Application of section 702.9(5).* The court made no specific findings, except that Tovar misstated the purpose for making the checks payable to him, to support its conclusion that Tovar did not intend to perform or that he knew he would not be able to do so. Moreover, section 702.9(5) provides that "[f]ailure to perform, standing alone, is not evidence that the actor did not intend to perform."

The Alabama court in *Smith v. State*, 665 So.2d 1002 (Ala.Crim.App.1995), discussed the application of an analogous Alabama statute. In that case, the state showed that the defendant had spent the customer's down payment for his own personal expenses, that he failed to produce the goods as promised, that he failed to telephone his customer to inform her of his problems, and that he failed to return the customer's money. The court noted that, under the Alabama statute, as with Iowa's, a defendant's failure to perform was not evidence of intent not to do so. The court concluded:

> These facts, taken in a light most favorable to the prosecution, prove only that the appellant failed to perform a contractual obligation he had with the victim, and as such, his actions constitute, if anything, a breach of contract, which merits a civil remedy. An affirmance under the facts presented in this case would only serve to cast prosecutors in the role of judgment collectors and encourage potential civil liti-

gants to seek a remedy in a criminal court in the form of restitution.

*Smith,* 665 So.2d at 1004. We agree.

The evidence in this case, when considered in its totality and in the light most favorable to the State, *Torres,* 495 N.W.2d at 681, does not support a finding of guilt under the definitions of deceit in either section 702.9(1) or section 702.9(5). We therefore vacate the decision of the court of appeals, reverse the judgment of the district court, and remand for entry of an order dismissing the charges.

**DECISION OF COURT OF APPEALS VACATED; JUDGMENT OF DISTRICT COURT REVERSED; CASE REMANDED.**