**STATE of Iowa, Appellee,**

v.

**James Edward RIVERS, Appellant.**

No. 97–1050.

Supreme Court of Iowa.

Dec. 23, 1998.

Linda Del Gallo, State Appellate Defender, and Tricia A. Johnston, Assistant State Appellate Defender, for appellant.

Thomas J. Miller, Attorney General, Martha E. Boesen, Assistant Attorney General, and Charles A. Stream, County Attorney, for appellee.

Considered by HARRIS, P.J., and LARSON, CARTER, NEUMAN, and TERNUS, JJ.

TERNUS, Justice.

The defendant, James Rivers, claims that the evidence is insufficient to support his convictions of two counts of second-degree theft and, therefore, the trial court erred in refusing to grant his motion for judgment of acquittal. One conviction arose out of Rivers' failure to pay a hotel bill. The other was

based on events occurring in connection with Rivers' remodeling business when he failed to complete work for customers who had already paid him. Although the latter conviction appears similar to the conviction this court reversed in *State v. Tovar*, 580 N.W.2d 768 (Iowa 1998), based on insufficiency of the evidence, the similarity is only superficial. We find the evidence here sufficient to support Rivers' convictions on both counts. Accordingly, we affirm.

## I. *Scope of Review.*

In reviewing a denial of a motion for judgment of acquittal based on insufficiency of the evidence, we consider the evidence in the light most favorable to the State. *See State v. Walker*, 574 N.W.2d 280, 284 (Iowa 1998). A finding of guilt is binding on the court "unless there is not substantial evidence in the record to support it or such finding is clearly against the weight of the evidence." *State v. LaPointe*, 418 N.W.2d 49, 51 (Iowa 1988). "Evidence is substantial if it could convince a rational fact finder that the defendant is guilty beyond a reasonable doubt." *State v. Bayles*, 551 N.W.2d 600, 608 (Iowa 1996). The evidence "must do more than raise suspicion, speculation, or conjecture"; it must raise a fair inference of guilt as to each essential element of the crime. *LaPointe*, 418 N.W.2d at 51.

## II. *Background Facts and Proceedings.*

Rivers was charged with second-degree arson in connection with a fire at his rental residence, *see* Iowa Code §§ 712.1, .3 (1995), second-degree theft based on his failure to pay a hotel bill at the Red Carpet Inn, *see id.* §§ 714.1(3), .2(2), and first-degree theft with respect to obtaining funds from customers without completing the promised work, *see id.* §§ 714.1(3), .2(1). The evidence at trial, viewed in a light most favorable to the State, revealed the following events giving rise to these charges.

Rivers was a self-employed home remodeling contractor. He ran his business out of his home in Oskaloosa, Iowa. Between September 1995 and January 1996, Rivers contracted for at least six remodeling jobs in the Oskaloosa area in which he took down pay-

ment money and never completed the work. In many cases, Rivers would begin the job, reach a certain point (generally when he had done about 50–60% of the work), request the balance or a portion of the contract payment, receive it and then, prior to completion of the job, fail to return. On February 2, 1996, Rivers filed a chapter 13 bankruptcy petition, his fourth bankruptcy petition in thirteen months.[1]

On the same day as the bankruptcy filing, Rivers' rented home was severely damaged in a suspicious fire. Rivers had rental insurance coverage and so, after the fire, an insurance adjuster contacted him at the Traveler's Budget Inn where he and his family were staying. The adjuster set up a $500 account at Walmart so the Rivers family could purchase some necessities. In addition, Rivers was given a $5000 advance payment that the adjuster said was to be used for the family's immediate expenses. (The policy limit for additional living expenses was $5500.)

Within a few days of the advance payment, Rivers asked for additional money from the insurer. By this time, however, the fire was being investigated as a potential arson. The adjuster refused to make a second advance and told Rivers that no further advances would be made and any temporary living expenses would have to be paid out of the initial $5000 advance. When the Budget Inn called the adjuster concerning payment of Rivers' bill, the adjuster informed the hotel that the insurer would not pay the bill, that Rivers had been given a $5000 advance, and that the hotel would have to collect the bill from Rivers. (There was testimony that it is customary in such situations for the insured to pay the hotel and be reimbursed by the insurer.)

The Rivers family stayed at the Budget Inn from February 2 through February 14, 1996. Prior to leaving, Rivers made one payment of $416 and requested that the balance of $257 be billed to the Red Cross of Mahaska County. (The Red Cross did cover this expense.)

After the family left the Budget Inn, they moved into the Red Carpet Inn. Initially, because of the circumstances of the fire, the

---

1. Rivers had previously filed chapter 13 petitions on January 13 and March 6, 1995. Both were dismissed for noncompliance. Rivers later filed a chapter 7 petition and received a discharge of his debts on September 15, 1995. The fourth

petition filed on February 2, 1996, was initially filed under a social security number that did not belong to Rivers. This filing was also subsequently dismissed for noncompliance and because of the prior bankruptcy filings.

hotel agreed to provide two large rooms to the Rivers family at a discounted rate. Rivers' wife gave the hotel a check for several nights rent. A few days later, however, Rivers showed the hotel the insurance policy provision providing coverage for temporary living expenses; Rivers asked to have his check returned and requested that the hotel bill the insurance company directly. Rivers and the hotel also agreed that the insurer would be billed at the full rate, rather than the original discounted rate.

The Rivers family stayed at the Red Carpet Inn for seventeen days. They left without checking out, without informing anyone where they were going, and without paying their bill. After several days, the hotel decided the Rivers family was not returning; the hotel cleaned out their rooms, which still contained clothes and a refrigerator full of food. The Red Carpet Inn submitted the bill for the Rivers' stay to the insurer, but the insurer refused to pay.

As noted earlier, Rivers was charged with second-degree arson, second-degree theft, and first-degree theft. The jury acquitted Rivers of the arson charge, but found him guilty of two counts of second-degree theft, one based on the Red Carpet Inn bill and one based on the unperformed remodeling jobs. Rivers appealed, challenging the sufficiency of the evidence to support his convictions. The case was transferred to the court of appeals, where the convictions were affirmed. We granted Rivers' petition for further review.

### III. *Crime of Second–Degree Theft.*

■ Rivers was convicted of theft by deception, a crime defined in Iowa Code section 714.1(3):

> A person commits theft when the person does any of the following:
>
> . . . .
>
> 3. Obtains the labor or services of another, or a transfer of possession, control, or ownership of the property of another, or the beneficial use of property of another, by deception.

The word "deception," as used in section 714.1(3), has been statutorily defined. In

this case, we are concerned with only one alternative of the definition: "knowingly . . . [p]romising payment, the delivery of goods, or other performance which the actor does not intend to perform or knows the actor will not be able to perform." Iowa Code § 702.9(5). Such intent or knowledge must exist at the time the defendant makes the promise of payment, delivery, or performance. *See State v. Hogrefe*, 557 N.W.2d 871, 879 (Iowa 1996).

■ Rivers claims there was insufficient evidence that he did not intend to pay his hotel bill or perform the promised work for his customers, or that he knew he would be unable to pay or perform. In examining the evidence of intent in the record, we keep in mind some basic principles applicable to theft by deception. The mere fact of nonpayment or a failure to perform will not support a finding of intent. *See* Iowa Code § 702.9(5) ("Failure to perform, standing alone, is not evidence that the actor did not intend to perform."); *Hogrefe*, 557 N.W.2d at 878. On the other hand, intent to deceive may be shown by circumstantial evidence. *See State v. Comes*, 245 Iowa 485, 491, 62 N.W.2d 753, 756–57 (1954).

### IV. *Theft Conviction Based on Unpaid Hotel Bill.*

■ Our review of the trial record reveals adequate evidence from which the jury could infer that Rivers did not intend to pay for the hotel rooms. Although Rivers claims that he believed the insurance company would pay his hotel bills based on his insurance coverage for additional living expenses, the adjuster testified that he unequivocally told Rivers before Rivers registered at the Red Carpet Inn that Rivers had to pay the hotel bill from the advance he had already been given. In fact, it was after the first hotel was informed by the insurer that Rivers was personally responsible for the hotel expenses that Rivers moved his family to a new, unsuspecting hotel. Once there, the family stayed for seventeen days and then left without checking out. Moreover, their abandonment of the premises without removing all their clothes and food left a false impression that they were coming back. From this conduct the

jury could have inferred that Rivers was attempting to delay any suspicion on the part of the hotel that they were skipping out on their bill. Finally, Rivers left no forwarding address where the bill could be sent and he never filed a claim with the insurance company for the Red Carpet Inn bill.

The inference of intent that can be drawn from these circumstances is validated by the theft-by-deception statute which provides:

> Where the compensation for goods and services is ordinarily paid immediately upon the obtaining of such goods or the rendering of such services, the refusal to pay or leaving the premises without payment or offer to pay or without having obtained from the owner or operator the right to pay subsequent to leaving the premises gives rise to an inference that the goods or services were obtained by deception.

Iowa Code § 714.1(3). Not only did Rivers fail to pay the hotel bill upon leaving, as is customary, he did not leave any forwarding address where the bill could be sent. The only evidence that he made any arrangements for later payment is the fact that he had earlier given the hotel the name and address of his insurance company. But the jury could have readily concluded that this information was given, not to facilitate payment of the bill (since Rivers had been told by the insurance company that it would not pay the bill), but rather was part of Rivers' scheme to obtain rooms for his family without spending any of the advance he had already received.

We conclude the evidence was sufficient to convince a rational trier of fact that Rivers rented the rooms without any intent to pay for them. Therefore, the trial court correctly denied Rivers' motion for judgment of acquittal on this charge.

## V. Theft Conviction Based on Business Transactions.

■ Rivers' second theft conviction stems from six remodeling contracts he undertook in the Oskaloosa area between September 1995 and January 1996. The evidence established that in each instance Rivers received either substantial partial payment or complete payment for the job, that he completed a portion of the work, or in one case, none at all, and that he then failed to finish the job. No refunds were made to any of his customers. There was additional evidence that Rivers had engaged in a similar pattern of conduct the previous year in Indianola.

Rivers argues that the State failed to prove that at the time of the down payments on the remodeling contracts he had no intention of completing the contracts or knew that he was unable to complete them, as required for proof of deception under section 702.9(5). We recently considered the applicability of section 702.9(5) in similar circumstances in the Tovar case. 580 N.W.2d at 772. A brief discussion of that case is helpful in analyzing the evidence in the case before us.

In Tovar, the defendant failed to perform two contracts for the installation of carpeting, after having received partial payments from his customers. Id. at 769. We noted that the only factual finding made by the trial court to support its finding of intent was that Tovar had lied to his customers as to why he wanted the down payment checks made out to him individually rather than being payable to his business. Id. at 772. We concluded the State had proved nothing more than that Tovar had failed to perform, a fact insufficient by itself to prove intent. Id.

The evidence of intent in the present case is far more substantial; the jury could have found from this evidence a common scheme or plan by Rivers to defraud his customers. Once Rivers established the initial contact with a customer, he used various ploys and reasons to persuade the customer to make additional and premature payments: Rivers would offer to throw in additional work for free; he said he had to have the money for payroll or his crew would not return; or he claimed he needed the money to move his shop or to buys tools or materials. Typically, the customer would pay the balance and Rivers and his crew would never return. Even when they did show up again, the work progressed slowly and eventually, before anything was completed, stopped entirely.

**412**

Another ploy used by Rivers was to find other projects on the premises that needed to be done. He would convince the customer that he could do the additional work; the original contract would be amended; and he would be paid additional moneys. The evidence suggests that when Rivers had milked the customer for as much as appeared possible, he never showed up again.

In addition, customers were often unable to contact Rivers. When they would reach him, he always had a reason why he had not performed. On several occasions when he suspected that his customers were unhappy with his progress and had complained to others about him, he threatened them with lawsuits.

Perhaps the most convincing evidence of Rivers' intent was the evidence that he had followed a similar pattern of conduct a year earlier in the Indianola area. *See Baker v. State*, 588 So.2d 945, 947 (Ala.Crim.App.1991) (holding evidence of other similar failures to perform support a finding that the defendant never intended to perform in the case before the court). Rivers' various bankruptcies also support the inference of an intent to deceive, rather than evidencing poor business management. As previously noted, Rivers had filed four petitions for bankruptcy within thirteen months. Although only one petition was fully processed, creditors, including the victims in the Oskaloosa area, received notices of the bankruptcy petitions and thus, as the trial court noted, would be disinclined to pursue Rivers for restitution. The trial judge made the following apt observation at sentencing:

> You are as surely a predator as a fox is when it comes to being able to talk people into down payments and then being able to walk away from performing the work that you had agreed to do. The scheme is obvious to me in the various bankruptcies and the notices that were sent knowing that you couldn't complete those bankruptcies but knowing that that would get people off your back for work that you had promised and didn't intend to complete.

As the trial court recognized, the jury could have found that the facts and circumstances surrounding these business transactions revealed a scheme to obtain money from unsuspecting individuals without any intent to perform the promised work. It is this evidence of intent that distinguishes the case before us from *Tovar*. We conclude, therefore, that the trial court correctly denied Rivers' motion for judgment of acquittal on this charge.

**DECISION OF COURT OF APPEALS AND JUDGMENT OF DISTRICT COURT AFFIRMED.**